IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CYNTHIA CRAWFORD and ELIZABETH HOLLON,

    Plaintiffs,
v.

CIVIL AIR PATROL, INC. and JOSHUA KARSTEN WELCH,

    Defendants.

CASE NO: 3:25-cv-737-WWB-MCR

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT CIVIL AIR PATROL'S MOTION TO DISMISS**

Plaintiffs Cynthia Crawford ("Captain Crawford") and Elizabeth Hollon ("Cadet Hollon") (collectively "Plaintiffs"), through undersigned counsel, and pursuant to Rule 12 of the Federal Rules of Civil Procedure, hereby submit this Response in Opposition to Defendant Civil Air Patrol's ("CAP") Motion to Dismiss.

**SUMMARY OF THE FACTS**

Cadet Hollon joined CAP at age twelve (12) in May 2018 and excelled in the cadet program, advancing to leadership positions including Squadron Commander, Group Cadet Advisory Council, and numerous other achievements. Doc. 12 ¶¶ 28-30.

Fellow cadet Joshua Welch lived as a guest in Hollon's home during 2020-2021. During that time, he used coercion to become romantically involved with Hollon and both physically and sexually abused her. Id. ¶¶ 33-39. In December 2021, when Hollon was 15 years old, Welch raped her. Id. ¶¶ 40-42.

On July 16, 2022, at a CAP encampment at Camp Blanding, an adult CAP senior member acting under color of CAP authority instructed all cadets that fraternization was

a violation of CAP policy, but the work around was to not get caught. Id. ¶ 49. After this reckless announcement, CAP leadership, again acting under color of CAP authority, gave a 16-year-old male cadet, Cadet R.P., keys to an unoccupied barracks. Id. ¶ 50. That night, Cadet R.P. and Cadet Hollon attempted to sneak to that unoccupied barracks when they encountered 18-year-old Welch who was serving as night watch cadre—a position of authority responsible for cadet safety. Id. ¶¶ 48, 53, 236. Welch, acting under color of authority for CAP, encouraged the two minors to continue on their way before following them. Id. ¶¶ 52-54. Welch then followed them and within the scope and course of his duties, used his CAP position and authority to access CAP facilities, pushed open the door to the unoccupied barracks, forcibly grabbed Hollon, exposed her genitals, and photographed her naked lower body without consent. Id. ¶¶ 55-58, 237-238. He then showed the photograph(s) to other male cadets. Id. ¶ 59.

Rather than protecting the victim, Wing Commander Col. Luis Negron deleted the photographic evidence from Welch's phone and allowed Welch to remain at the encampment with continued access to minor cadets. Id. ¶¶ 62-64. CAP failed to report the incident to the Department of Children and Families until July 23, 2022—five days after gaining knowledge of what transpired and only after learning Hollon would report to law enforcement. Id. ¶¶ 67, 89. CAP suspended Hollon under CAPR 35-1 on July 19, 2022, a regulation designed for suspected abusers, not victims. Id. ¶¶ 72-73. The suspension unjustly and without cause stripped her of all leadership positions and barred her from CAP activities. Id. ¶ 75.

CAP regulations constitute contractual obligations to cadets, including duties to act in loco parentis, maintain zero tolerance for abuse, report abuse as required by law,

provide adequate supervision, and immediately suspend abusers. Id. ¶¶ 76-87, 245. CAP breached these obligations by: improperly suspending the victim instead of the perpetrator; destroying evidence; failing to timely report to authorities; allowing Welch continued access to cadets; extending Hollon's suspension beyond the 60-day regulatory limit; and denying her leadership opportunities, scholarships, and participation in CAP activities for over two years. Id. ¶¶ 89-100, 246.

CAP's extreme and outrageous conduct included punishing the sexual assault victim while protecting her attacker, destroying evidence of child sexual abuse material, subjecting a minor victim to ongoing retaliation for over two years, making false statements about her character to prevent scholarships, and causing additional trauma to a vulnerable minor. Id. ¶ 261. As a direct result, Cadet Hollon suffered severe post-traumatic stress disorder, major depressive disorder, suicidal ideation, self-harm, reputational harm, loss of educational and career opportunities, ongoing medical treatment needs, loss of enjoyment of life, and permanent alteration of her life trajectory, amongst other compensable harms. Id. ¶¶ 146-152, 263.

## ARGUMENT

Plaintiff Elizabeth Hollon concedes Counts 1, 2, and 3 of the First Amended Complaint and does not oppose Defendant CAP's Motion to Dismiss those counts. Defendant CAP has not moved to dismiss Counts 4-7; as such, any arguments to dismiss these claims have been waived. Accordingly, this Opposition Brief addresses Defendant CAP's Motion to Dismiss Counts 8, 9, 10, and 11.

I. **LEGAL STANDARD**

Rule 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint

3

must be accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low." *Ancata v. Prison Health Svcs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985). Pursuant to the federal rules, a claimant must only state "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard does not require "detailed factual allegations," but demands more than an unadorned accusation. Dismissal at this early stage is inappropriate where plaintiff's complaint states "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

## II.    CAP IS VICARIOUSLY LIABLE FOR WELCH'S BATTERY OF HOLLON UNDER RESPONDEAT SUPERIOR

Defendant has argued that Count 8 for *respondeat superior* is not supported as a matter of law because (1) Welch was not an employee of CAP, and (2) that if Welch was alleged to be an agent of CAP, that his sexual assault was outside the scope and course of his duties. In an effort to narrow the issues, Plaintiff Hollon has not alleged that Welch was an employee of CAP. Instead, Plaintiff Hollon has alleged CAP is vicariously liable for Welch's tortious conduct under the doctrine of *respondeat superior* because Welch acted as CAP's agent within the course and scope of his assigned duties when he committed a battery and the creation of child pornography against Hollon. Doc. 12 ¶¶ 234-242. To establish vicarious liability at the motion to dismiss stage, Plaintiffs need only plausibly allege that an agency relationship existed and that the tort occurred within the scope of that agency. The First Amended Complaint satisfies both elements.

A. **Welch Was Acting As CAP's Agent**

Under Florida law, actual or apparent agency may exist; in this case, both actual and apparent agency have been plausibly alleged.

1. **An Actual Agency Relationship Exists Between CAP and Welch**

To establish an actual agency relationship, a Plaintiff must demonstrate: "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Bamert v. Pulte Home Corp.*, No. 6:08-cv-2120-Orl-22GJK, 2013 U.S. Dist. LEXIS 202021, at *12 (M.D. Fla. 2013) (quoting *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 853 n.10 (Fla. 2003) (citation omitted)). A principal may be held vicariously liable for the acts of their agent committed within the scope of the agent's authority. *Amstar Ins. Co. v. Cadet*, 862 So. 2d 736, 741 (Fla. 5th DCA 2003). An actual agency relationship existed between CAP and Welch during the July 16, 2022 encampment.

**Element 1:** The principal, CAP, acknowledged that Welch would act for it when it assigned Welch to serve as night watch cadre, a position of authority responsible for ensuring the safety and security of minor cadets. Doc. 12 ¶¶ 48, 53. This was not merely casual participation in a youth program—Welch held an official role as a "standards and evaluation officer" with specific supervisory duties over other cadets. Id. ¶ 53. By placing an 18-year-old in a position of authority over younger cadets at a residential encampment and charging him with their protection, CAP purposefully empowered Welch to act on its behalf. Id. ¶ 236.

**Element 2:** The agent, Welch, accepted the undertaking by serving in the role of the night watch cadre and assuming and using the authority given to him when he encouraged Cadets Hollon and R.P. to continue on their way before following them. Id.

5

¶¶ 52-54. He further accepted the undertaking when he used his CAP position and authority to access CAP facilities, pushed open the door to the unoccupied barracks, forcibly grabbed Hollon, exposed her genitals, and photographed her naked lower body without consent. Id. ¶¶ 55-58, 237-238. All of these actions were alleged to have been done under color of authority as the night watch cadre.

**Element 3:** The principal, CAP, had control of the actions of the agent. Notably, this is determined by the principal's "right to control, rather than the actual control" in determining if this element is met. *Villazon*, 843 So. 2d at 853. CAP's appointment of Welch to this supervisory position vested him with authority to oversee cadet activities during overnight hours, gave him access to all areas of the encampment facility, and designated him as the responsible party for cadet safety. Doc. 12 ¶¶ 53, 237. CAP had the power to remove his authority just as much as they had the power to vest him with it. This element therefore raises an issue of fact. *See Villazon*, 843 So. 2d at 853 (when there are multiple pieces of evidence and circumstances to be evaluated, "and the totality of the evidence is susceptible to multiple inferences and interpretations, the existence and scope of an agency relationship are generally questions of fact.")

Plaintiffs have plainly alleged sufficient facts to meet each of the elements to plausibly allege an actual agency relationship between CAP and Welch. Further, the numerous circumstances surrounding element three (3) necessitate a determination of fact. *See Wiand v. Montie*, No. 8:20-cv-863-T-60SPF, 2020 U.S. Dist. LEXIS 203959, at *2 (M.D. Fla. Nov. 2, 2020) (a motion to dismiss only tests the legal sufficiency of a complaint and is not the proper procedural tool to resolve factual disputes).

**2.  An Apparent Agency Relationship Exists Between CAP and Welch**

To establish an apparent agency relationship, a Plaintiff must demonstrate: "[1] a representation by the purported principal; [2] a reliance on that representation by a third party; and [3] a change in position by the third party in reliance on the representation." *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995).

**Element 1:** The principal, CAP, represented that Welch was its agent when it specifically assigned Welch to serve as night watch cadre as a standards and evaluation officer and assigned him a position of authority responsible for ensuring the safety and security of minor cadets and allowing him to take action against younger cadets to comply with his assigned duties. Doc. 12 ¶¶ 48, 53, 236.

**Element 2:** Cadet Hollon, a third-party to this principal-agent relationship, relied on that representation. When she encountered Welch after hours on her way to the unoccupied barracks, she realized she was talking to someone with authority over her being out of bed after hours. After discussing her plans with Welch, instead of telling them to return to bed, he encouraged her and Cadet R.P. to continue and then immediately followed and "busted" them for breaking the rules. Id. ¶¶ 52-56. Cadet Hollon relied on CAP's assignment of Welch's agency when she went to the barracks after Welch gave her "permission" to continue.

**Element 3:** Cadet Hollon, a third-party to this principal-agent relationship, relied on the misrepresentation of Welch. Id.

Plaintiffs have plainly alleged sufficient facts to meet each of the elements to plausibly allege an apparent agency relationship between CAP and Welch.

### B. Welch's Battery Occurred Within the Scope of His CAP Duties

Defendant CAP erroneously asserted that Plaintiff Hollon failed to state a cause of action for vicarious liability. Under Florida law, "an employer cannot be held [vicariously] liable for the tortious or criminal acts of an employee, **unless** the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer." *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.,* 783 So. 2d 353, 356 (Fla. 3d DCA 2001) (emphasis added). An employee's conduct is within the scope of his employment when it "(1) is of the kind the employee is hired to perform, (2) occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) is activated at least in part by a purpose to serve the master." *Goss v. Human Servs. Assocs., Inc.,* 79 So. 3d 127, 132 (Fla. 5th DCA 2012).

In *Hennegan v. Dep't of High. Saf. & Motor Veh.*, a State trooper, acting under color of authority, approached a child walking home from school and deceptively told her that she was under suspicion for theft, and that she had to get in his car to be searched. The trooper took the child to a remote area and sexually assaulted her. The Court held that "conduct is within the scope of employment if it occurs substantially within authorized time and space limits, and it is activated at least in part by a purpose to serve the master. The **purpose** of the employees act, rather than the **method of performance** thereof is said to be the important consideration." *Hennegan v. Dep't of High. Saf. & Motor Veh.*, 467 So.2d 748, 751 (Fla. 1st DCA 1985) (citing 2 Fla.Jur.2d Agency and Employment § 213). The trooper was obviously not employed to commit sexual abuse of a child and the abuse itself did not further the interest of DHSMV. Even so, the Court determined that as it was alleged in the complaint, it was "not impossible to attribute the alleged actions of [the

trooper], at least in part, to misfeasance and/or overzealousness in the performance of his official duties" and therefore, the motion to dismiss should be denied. *Id.*

In this case, the Complaint sufficiently and plausibly alleged that Welch was acting within the scope and course of his duties, and was, at least in part, acting within the misfeasance and/or overzealousness of his official duties when he burst into the unoccupied barracks to stop Cadets Hollon and R.P. from fraternizing. Doc. 12 ¶¶ 50-58, 237. Indeed, he was presumably upholding (some) of CAP's policies and patrolling the grounds at night to stop minor cadets from sneaking out or engaging in fraternization. Identical to *Hennegan*, he met the **purpose** of CAP's assignment of his duties, albeit not the **method of performance**, and therefore vicarious liability has been properly alleged. The battery occurred at a CAP-sponsored event, during Welch's assigned shift, in a location he accessed through his official role, while he was exercising the supervisory authority CAP vested in him. These allegations plausibly establish that Welch's tortious conduct occurred within the scope of his agency relationship with CAP. *Id.* ¶ 238.

### III. CAP BREACHED ITS CONTRACTUAL OBLIGATIONS TO PLAINTIFFS

Defendant CAP has argued that Counts 9 and 10 should be dismissed because they do not plausibly allege Breach of Contract claims. This argument fails.

In a bizarre change, after spending half the Motion to Dismiss arguing that the Civil Air Patrol is not an extension of the federal government, nor do any of the allegations of this Complaint constitute government action on behalf of the government, Defendant CAP turned around and argued that "federal statute or regulation does not inherently create a contractual relationship between an individual and the United States." MTD, Doc. 21 at p. 13. Plaintiff rejects that it applies to this case, as CAP was not acting on behalf of the Air Force or the federal government, but rather, was acting in its non-profit capacity as a

9

private entity. Doc. 12 ¶ 19. Any argument about the United States being a party is irrelevant, and any case examples cited by defense to support the same arguments are off-base and should be disregard.

Organizational regulations can serve as contracts under certain circumstances, but their enforceability as contractual obligations depends on specific factors. In the Eleventh Circuit, for a regulation to be incorporated into a contract and enforceable as a contractual term, it must be referenced in a way that establishes a "reasonably clear and ascertainable meaning." *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126 (11th Cir. 2014). As Defendant CAP knows from public and their own records, the CAP Cadet Membership Application asks the parents of child cadets to agree to abide by CAP policies and regulations and agrees to pay a membership fee.[1] The adult membership application requires an agreement to adhere to the CAP Regulations.[2] Both require membership fees to be paid in consideration.

Plaintiffs plausibly alleged that CAP's own regulations, as agreed to by the memberships applications, created enforceable contractual obligations to its cadets that the organization systematically violated when it responded to Welch's assault by punishing Hollon and protecting her attacker. Id. ¶¶ 243-250. These regulations establish clear, specific duties owed to cadets like Hollon, and CAP's wholesale abandonment of those duties following the July 16, 2022 incident constitutes material breach of contract.

### A. CAP's Regulations Constitute Contractual Obligations

When Hollon joined CAP's cadet program, she entered into a contractual

---

[1] See https://www.gocivilairpatrol.com/media/cms/CAPF_15_Cadet_Application_ Oct_22__L_A92039963E272.pdf
[2] See https://www.gocivilairpatrol.com/media/cms/F_12_FAAE032949645.pdf

relationship governed by CAP's extensive regulatory framework. Id. ¶ 244. These regulations define the organization's duties to cadets and establish the terms under which cadets participate in CAP programs and receive the benefits of membership, including leadership opportunities, educational programs, scholarships, and advancement. Id. ¶ 249. The regulations are not merely aspirational policies—they impose mandatory obligations using directive language such as "will," "must," and "required" throughout their provisions. Id. ¶¶ 76-87.

CAP's cadet protection regulations specifically establish contractual duties including: acting in loco parentis with all cadets; maintaining zero tolerance for physical, sexual, or emotional abuse; reporting to law enforcement all reasonable suspicions of abuse as required by law; providing adequate supervision of every cadet activity; immediately suspending members for alleged or suspected cadet abuse; and terminating members who engage in abusive behavior. Id. ¶¶ 76-77, 82, 86-87, 245. These were not suggestions—they were promises to parents and cadets about the standards CAP would maintain to protect minors in its care if those minors chose to participate as cadets in CAP.

### B. CAP's Wrongful Suspension of the Victim Violated CAPR 35-1

Although the Complaint details numerous breaches, CAP's most egregious breach was suspending Hollon under CAPR 35-1, a regulation explicitly "designated for 'Suspected Cadet Abuse'" and "intended to be applied to suspected abusers, not victims of abuse." Id. ¶¶ 72-73. On July 19, 2022—just two days after Hollon reported the assault to police—CAP issued her a formal suspension that stripped her of all leadership positions and barred her from participating in any CAP activities. Id. ¶¶ 74-75, 96.

This application of CAPR 35-1 was not merely improper—it was an inversion of

11

the regulation's entire purpose. Section 2-2(a)(3) states: "Commanders will immediately suspend any member for alleged or suspected cadet abuse, when credible unfavorable information is received which, if substantiated, would make the member subject to termination." Id. ¶ 87. Hollon was the victim of cadet abuse, not the perpetrator. She was not subject to suspension. CAP had no authority under its own regulations to suspend her. Id. ¶¶ 75, 96.  CAP compounded this breach by extending Hollon's suspension beyond the 60-day regulatory limit imposed by CAPR 35-1, Section 2-2(a)(3). ¶¶ 87, 98. The regulation explicitly states that suspension "is effective for up to 60 days," yet CAP kept Hollon suspended and denied her leadership opportunities for over two years. ¶¶ 98, 110, 113.

### C. CAP Violated Mandatory Reporting Requirements

CAPR 60-2 (2019), Section 4.2 required adult members who developed "a good faith suspicion or belief of cadet abuse (sexually, physically, neglect, or emotionally) to report immediately to CAP through the chain of command." Id. ¶ 83. Section 4.2.5 established a 48-hour timeline for forwarding complaints alleging sexual or physical abuse to CAP's General Counsel and the Commander of CAP. ¶ 85. Section 1.4.3 required CAP members to follow state mandatory reporting laws, with those laws superseding CAP regulations in case of conflict. Id. ¶ 78.

Despite having immediate knowledge on July 16, 2022 that Welch had committed physical battery and created child sexual abuse material, CAP personnel—including Wing Commander Col. Luis Negron—failed to report the incident to the Department of Children and Families until July 23, 2022, a delay of five days that violated both CAP regulations and Florida law. Id. ¶¶ 67, 89, 91. This delay only ended after learning that Hollon would report to law enforcement herself. Id. ¶ 67.

12

### D. CAP Failed to Provide Adequate Supervision

CAPR 60-2 (2019), Section 2.6.4 required "adequate supervision of every cadet activity by at least two adults to prevent misconduct during CAP activities." Id. ¶ 82. CAP leadership at the encampment "failed to maintain proper oversight and supervision, allowing insufficient supervision that directly enabled Welch's physical battery, sexual abuse, hazing, and/or bullying of Cadet Hollon." Id. ¶ 95. Moreover, CAP had given Cadet R.P. the keys to an unoccupied barracks, creating the unsupervised environment that facilitated the assault. Id. ¶ 51.

### E. CAP Violated Investigation Timeline Requirements

CAPR 20-2 (2020), Section 11.11.5 requires that the entire Complaint Resolution process "must not exceed 180 days absent a justifiable reason." Id. ¶¶ 114, 143. Yet Hollon has been notified for over two years that she cannot hold any leadership role or position until a pending Inspector General investigation is concluded, despite never being told the basis of the IG complaint, never being interviewed, and never receiving information about when the matter will resolve. Id. ¶ 113. This investigation has been open for far more than 180 days without valid justification, in direct violation of CAP's own regulatory timelines. Id. ¶ 115.

Section 11.7.1 requires that once an IG investigation is determined warranted, the subject must be notified. Id. ¶ 116. CAP violated this provision by denying Hollon any notice of what the investigation concerns or what allegations it contains. Id. ¶ 117.

### F. CAP Denied Educational Benefits and Made False Statements

As consideration for her participation in the CAP contract, Hollon was entitled to participate in CAP events, groups, and cadet programs; to be part of the CAP cadet community; to receive leadership and scholastic opportunities to enhance college and

13

career applications; and to enlist as an E3 Air Force advanced enlistment rank. Id. ¶ 249. CAP denied her all of these benefits while providing them to male cadets, including Welch. Id. ¶¶ 103-106.

CAP further breached its duty by making false statements about Hollon's character to prevent her from receiving educational benefits, including improperly disclosing confidential IG investigation information to justify denying her scholarship applications in violation of CAPR 20-2, Section 11.8.3. Id. ¶¶ 118-120.

### G. CAP Breached Its Contractual Obligations to Crawford by Weaponizing Its Investigative Process as Retaliation

CAP's regulations created enforceable contractual obligations to senior members like Crawford that the organization systematically violated when it responded to her reporting of her daughter's assault by subjecting Crawford to retaliatory, untimely, and procedurally deficient investigations. Id. ¶¶ 251-258. When Crawford joined CAP and accepted positions including Assistant Wing Legal Officer and Deputy Commander for Cadets, she entered into contractual relationships governed by CAP's regulatory framework establishing mandatory obligations, procedural protections, and member rights. Id. ¶ 252.

CAP violated multiple core regulatory requirements in its treatment of Crawford. CAPR 20-2 (2020) and CAPR 123-1 (2021) require that "the entire Complaint Resolution process must not exceed 180 days absent a justifiable reason," yet CAP's investigation has been open for more than 180 days without any valid justification. Id. ¶¶ 114-115, 143-144. Wing Commander Col. Negron initiated a Commander's Inquiry against Crawford alleging events well over 60 days prior, violating CAPR 20-2, Section 11.5.1 and CAPR 123-1's requirement that IG complaints "must be submitted within 60 days of the

14

occurrence or action upon which the complaint is based." Id. ¶¶ 138-139. Significantly, these untimely allegations were only filed after Crawford reported complaints about the treatment of her daughter, demonstrating the retaliatory nature of the proceedings. Id. ¶ 140.

The investigation violated CAPR 20-1 and CAPR 123-1's requirement that "the IG program must be an independent, impartial, and objective process" because it was initiated by Wing Commander Luis Negron—the very commander whom Crawford had identified as mishandling the July 16, 2022 incident involving her daughter. Id. ¶¶ 141-142. Crawford has been notified that an IG investigation is ongoing but has been denied any notice of what it concerns or what allegations it contains, violating CAPR 20-2, Section 11.7.1's notification requirement. Id. ¶¶ 116-117. Col. Negron further violated CAPR 20-2, Section 11.8.3's confidentiality requirement by improperly disclosing information about ongoing IG investigations to justify adverse actions against Crawford and her daughter. Id. ¶¶ 119-120.

Beyond procedural violations, CAP directly retaliated against Crawford. On September 8, 2022, shortly after Col. Negron instructed Crawford not to report because it would "ruin [his] legacy," Negron issued Crawford a letter of reprimand and imposed a 30-day suspension without just cause. Id. ¶¶ 124-125. CAP removed Crawford from her positions as Assistant Wing Legal Officer and Deputy Commander for Cadets and barred her from command assignments and cadet supervision for six months—punishment for defying Negron's unlawful command not to report child abuse to police. Id. ¶¶ 128-130. CAP leadership also failed to follow the requirements of CAPR 36-2 (2012) by not forwarding Crawford's discrimination and retaliation complaints to the CAP Equal

15

Opportunity Officer and failing to conduct the required investigation. Id. ¶ 109.

As a direct result of CAP's material breaches, Crawford suffered loss of professional opportunities, damage to her reputation as both an exemplary attorney and former Wing Legal Officer, loss of community, and loss of an invaluable opportunity to connect with her children through CAP during their formative years. Id. ¶¶ 132-134, 258.

When taken in a light most favorable to the non-moving party, Plaintiffs have plausibly pled Breach of Contract and this matter should be permitted to progress to discovery on the issues for both Counts 9 and 10.  Should this Court find that either Count 9 and/or 10 does not adequately plead a breach of contract claim, Plaintiff requests leave to amend to add additional allegations to sufficiently allege these claims.

## IV.  CAP ENGAGED IN EXTREME AND OUTRAGEOUS BEHAVIOR

Defendant CAP has argued that this claim fails based on one of the elements of Intentional Infliction of Emotional Distress ("IIED"): whether Defendant's conduct was outrageous.  Notably, Defendant CAP does not contest the other three elements of IIED. Plaintiff Hollon agrees that the determination of whether the conduct is outrageous is a matter of law to be decided by this Court at the pleading stage.  *Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 928 (Fla. 4th DCA 2007); *Gandy v. Trans World Comput. Tech. Grp.*, 787 So. 2d 116, 119 (Fla. 2d DCA 2001) (citing *Ponton v. Scarfone*, 468 So. 2d 1009, 1011 (Fla. 2d DCA 1985)); *De La Campa v. Grifols Am., Inc.*, 819 So. 2d 940, 943 (Fla. 3d DCA 2002).

To support a claim for IIED, the conduct in question must be so extreme and outrageous as to go beyond "all possible bounds of decency" and be "regarded as atrocious and utterly intolerable in a civilized community." *Mallock v. S. Mem'l Park, Inc.*, 561 So. 2d 330, 332 (Fla. 3d DCA 1990).  "Generally, the case is one in which the

recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.*

CAP engaged in extreme and outrageous conduct that exceeded all bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community. Doc. 12 ¶ 260. The organization's systematic pattern of punishing a minor sexual assault victim while protecting her attacker, destroying evidence, and subjecting a vulnerable teenager to years of retaliation satisfies the demanding standard for intentional infliction of emotional distress.

CAP's conduct was not a single improper decision, but a coordinated institutional response designed to silence and punish a victim for reporting sexual assault to law enforcement. Immediately after Hollon reported Welch's July 16, 2022 battery and creation of child sexual abuse material to police, CAP leadership took deliberate steps to destroy evidence by deleting the photographs from Welch's phone and allowed him to remain at the encampment with continued access to other minor cadets. Id. ¶¶ 62-64. This was not merely negligence—it was a conscious choice to eliminate proof of a crime and prioritize their own interests over the safety of children in CAP's care. As a direct result of CAP's intentional conduct, Hollon suffered severe emotional distress. Id. ¶¶ 146-150, 263.

Defendant CAP argues that FL workplace discipline does not constitute IIED in the same brief that they argued there was not an employee relationship. Plaintiff acknowledges there was not an employee relationship and is therefore moot.

When taken in a light most favorable to the non-moving party, Plaintiff has plausibly pled a claim of IIED and this matter should be permitted to progress to discovery on the

issues. Should this Court find that this Court does not meet the outrageous standard, Plaintiff requests leave to amend to add additional allegations to better demonstrate the outrageous conduct exhibited by CAP.

## CONCLUSION

For the reasons stated herein, CAP's Motion to Dismiss should be denied. Should this Court grant this motion, Plaintiffs requests that any such dismissal be without prejudice and Plaintiffs requests leave to amend the Complaint to plead additional facts or correct any pleading deficiencies.

Date: <u>January 5, 2026</u>                    Respectfully Submitted,

                                                        */s/ Lisa D. Haba*
**Lisa D. Haba** (FBN: 0077535)
**Maria E. Bryant** (FBN: 0055332)
The Haba Law Firm, P.A.
1220 Commerce Park Dr., Ste. 207
Longwood, FL 32779
T: (844) 422-2529
E-mail: lisahaba@habalaw.com
E-mail: mariabryant@habalaw.com